IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CT-3242-D

ELDRIDGE EDGER HODGES,        )
                              )
            Plaintiff,        )
                              )
    v.                        )        **ORDER**
                              )
BETTY BROWN, and              )
FRANK PERRY,                  )
                              )
            Defendants.       )

Eldridge Edger Hodges ("Hodges"), a state inmate proceeding pro se, filed this action under 42 U.S.C. § 1983, alleging violations of his First Amendment rights and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq. [D.E. 1].[1] On May 24, 2012, the court reviewed Hodges's complaint under 28 U.S.C. § 1915A and allowed the action to proceed [D.E. 5], and the clerk directed North Carolina Prisoner Legal Services ("NCPLS") to investigate Hodges's claims [D.E. 6].

On August 15, 2012, NCPLS responded to the order of investigation, stating that appointment of counsel was not warranted and that it had provided advice and assistance to Hodges [D.E. 11]. On May 3, 2013, the court denied defendants' motion to dismiss and referred the case to Magistrate Judge James E. Gates for a scheduling order [D.E. 21]. On December 10, 2013, the court granted in part defendants' motion for summary judgment and dismissed as moot plaintiff's claim concerning work proscription days, and sought responses from the parties concerning a revised

---

[1] Although plaintiff filed this suit under the name "Hodges," he was committed to custody under the name "Hodge." See Offender Public Information, N.C. Dep't of Public Safety, http://webapps6.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0186037&searchOffenderId=0186037&listurl=pagelistoffendersearchresults&listpage=1 (last visited Feb. 20, 2015).

scheduling order [D.E. 32].² On March 31, 2014, the court granted in part plaintiff's motion for reconsideration and permitted Hodges to use the court's electronic filing service to serve defendants with copies of his filings [D.E. 45]. The court also referred the case to Magistrate Judge Robert B. Jones, Jr. for a revised scheduling order to include a brief period for discovery. Id.

On June 5, 2014, Hodges moved to compel discovery [D.E. 52], which Magistrate Judge Jones denied as moot on June 6, 2014 [D.E. 53]. On June 18, 2014, Hodges filed objections to Magistrate Judge Jones's June 6, 2014 order. See [D.E. 55]. On June 24, 2014, Hodges renewed his request for appointed counsel [D.E. 56]. On June 30, 2014, defendants filed a second motion for summary judgment [D.E. 57]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Hodges about the motion, the consequences of failing to respond, and the response deadline [D.E. 59]. On July 10, 2014, Hodges moved "to deny or stay" defendants' second motion for summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure [D.E. 60]. On July 23, 2014, Hodges responded in opposition to the second motion for summary judgment [D.E. 61]. On July 31, 2014, Hodges moved to supplement his response in opposition with additional evidence [D.E. 62].³ As explained below, the court grants in part defendants' motion for summary judgment.

I.

When Hodges filed this action, he was incarcerated at Avery-Mitchell Correctional Institution ("AMCI"). Compl. [D.E. 1] ¶ 2, at 4. On May 7, 2013, the Department of Public Safety ("DPS")

---

² On December 10, 2013, the court substituted Frank Perry, the current Secretary of the Department of Public Safety, for Kieran Shanahan, the former Secretary, as respondent. See Fed. R. Civ. P. 25(d).

³ The court grants this motion and considers all of Hodges's filings in ruling on the motion for summary judgment.

2

transferred Hodges to Scotland Correctional Institution ("Scotland"). See [D.E. 23]; Saunders Aff. [D.E. 29-1] ¶ 5; Pl. Aff. [D.E. 31-1] ¶ 6. Hodges "is a practitioner and adherent of 'Orthodox Messianic Judaism,' which is a 'non-Christian' based faith." Compl. ¶ 3, at 4. Hodges was reared in the faith and has practiced it since childhood. Id. As an Orthodox Messianic Jew, Hodges "remain[s] zealous of the Torah (law-instructions)," id. ¶ 5, at 5, and adheres to the Shulchan Aruch, the codes of Jewish Law, which are prescribed "for all observant Jews of all sects of Judaism." Id. ¶¶ 3–4, at 4.

As of February 2010, DPS did not recognize Messianic Judaism as an approved faith group for inmates. See Pl.'s Resp. Opp'n Mot. Summ. J. [D.E. 61] 3.[4] On February 10, 2010, Hodges began the process to gain DPS recognition of Messianic Judaism. Compl. ¶ 7, at 5–6; see Pl.'s Resp. Opp'n Mot. Summ. J. 3. Specifically, Hodges sought DPS recognition of Messianic Judaism, a waiver of DPS's quorum requirement for corporate worship because Orthodox Messianic Jews "are

---

[4] According to defendant Betty Brown, the director of Chaplaincy Services for DPS:

> Prior to July 2010 [DPS] did not officially recognize, approve or authorize the practice of Messianic Judaism. In early 2010 [DPS] received intelligence that a small group of self-declared Messianic Jewish inmates in prisons in the Western part of the state were White Supremacists, who used the faith practice to mask their gang activity, including recruitment and indoctrination. An internal investigation was launched to verify the security threat . . . . The threat posed by the White Supremacist inmates in the western part of the State was verified, and those inmates were transferred throughout the state prison system to neutralize the threat their recruiting and indoctrination posed . . . . At or about the same time, other inmates at different units, including those units to which the White Supremacist Messianic Jewish inmates had been transferred, began efforts to have Messianic Judaism recognized by [DPS].

Brown Aff. [D.E. 57-1] ¶¶ 11, 13, 15; cf. Pl.'s Ex. 4 [D.E. 61-1] ¶ 16, at 86 (Shimon affidavit) (acknowledging that "many White Supremacists have tried to infiltrate Messianic Judaism, not only in the civilian sector, also in the correctional sector"). Brown does not "suggest that Plaintiff is a white supremacist or a racist[.]" Brown Aff. ¶ 16.

3

a very small minority group" of inmates, recognition of holy days as "work proscription days" during which Hodges would not be required to work, kosher meals, and access to certain religious items for worship. Compl. ¶ 7, at 6–7; see Pl.'s Resp. Opp'n Mot. Summ. J. 3–4. On March 23, 2010, AMCI's chaplain, Dennis Hartman, wrote to defendant Betty Brown ("Brown") in support of Hodges's application for DPS recognition of Messianic Judaism. See Pl.'s Ex. 3 [D.E. 61-1] 77–78. Chaplain Hartman described Hodges as "respectful, soft-spoken, and reasonable[,]" and questioned the likelihood of inmates using the faith as a cover for violent activities. Id.

DPS's Religious Practices/Chaplaincy Services Committee ("the RPC") "undertook research and conducted a series of meetings" between March 5 and June 7, 2010, "in order to determine whether Messianic Judaism ought to be recognized within [DPS] and if so, in order to formulate a policy to allow its practice." Brown Aff. [D.E. 57-1] ¶ 17. "The RPC consulted with Messianic Rabbis, Messianic experts and practitioners of Messianic Judaism in and outside of North Carolina . . . in order to understand Messianic Judaism's tenets, its requirements of its adherent and its practice outside the prisoner context." Id. ¶ 18. Brown consulted with prison officials in other states, obtained their religious policies concerning Messianic Judaism, and learned that it was recommended that Messianic Jews be accorded separate religious activities because "Messianic theology can be disruptive of both Jewish and Protestant activities." Brown Aff. ¶¶ 20–21 & Exs. [D.E. 57-1] 36–38.

In July 2010, the RPC voted to recognize Messianic Judaism as an approved religion and drafted a DPS policy for then-Secretary Alvin Keller's approval. Compl. ¶ 10, at 8; Brown Aff. ¶ 25. On July 19, 2010, DPS promulgated a Messianic Judaism policy. Brown Aff. ¶ 25; see [D.E. 1-1] 10–14 (original DPS policy recognizing Messianic Judaism). After implementing the policy, the RPC again met with "area Messianic Jewish leaders . . . . to ensure the policy comported with

4

the tenets of Messianic Judaism." Brown Aff. ¶ 26. "In anticipation of contemplated amendments to [DPS's] Messianic Judaism policy," Brown obtained a copy of the Messianic Judaism policy for the Washington state prison system. Brown Aff. ¶ 27 & Exs. [D.E. 57-1] 45–58.

On November 28, 2011, Hodges filed suit [D.E. 1]. When Hodges filed suit, the DPS already recognized Messianic Judaism. Nonetheless, Hodges contends that the "New Religious Policy governing Messianic Judaism places substantial burdens upon his free exercise rights afforded to him under the U.S. Constitution and RLUIPA[.]" Compl. ¶ 16, at 10. Hodges's surviving claims concern Hodges's access to kosher meals and DPS's policy regarding corporate worship. Hodges seeks declaratory and injunctive relief. See id. 27–32.

On October 22, 2012, DPS amended its Messianic Judaism policy. See Brown Aff. ¶ 30 & Exs. [D.E. 57-1] 59–63 (amended DPS policy). As relevant to Hodges's remaining claims, the DPS policy now states that "Messianic Jewish worship services may be provided if a volunteer is available; if a volunteer is not available [an adherent] may choose to attend Christian services." Brown Aff. ¶ 31 & Exs. [D.E. 57-1] 59. DPS "allows Messianic Jewish corporate worship on the Sabbath and designated Holy Days when led by an outside Messianic Jewish volunteer." Brown Aff. ¶ 33. DPS also permits Messianic Jews to engage in private worship and to possess certain sacred items to foster private devotion. Brown Aff. ¶ 34.

DPS states that it requires an outside volunteer for corporate worship to conserve personnel resources and to "ensure[] the purity of the doctrinal message and teaching." Id. ¶ 33. The outside-volunteer requirement also "ensures that no one inmate assumes a position of power and authority vis-a-vis another" and promotes institutional security by preventing inmates from using worship services "to mask their illicit activities." Id.; see Saunders Aff. ¶ 14. Brown solicits Messianic

5

Jewish community volunteers four times per year in an effort to facilitate corporate worship opportunities. Brown Aff. ¶ 36.

Hodges has presented evidence that DPS rejected applications of or terminated volunteer permissions for at least four Messianic community volunteers. Ennis Aff. [D.E. 62-1] ¶¶ 5–6, 10, 14, 16, 26; see Pl.'s Ex. 4 [D.E. 61-1] ¶ 23, at 88 (Shimon affidavit); Pl.'s Ex. 8 [D.E. 61-1] 150–52 (letter indicating that DPS has rejected a Messianic rabbi's volunteer application "several times . . . with no explanation as to why since he has a clean record"). There are Messianic community volunteers who lead worship services in the western part of the state. Pl.'s Ex. 3 [D.E. 61-1] 82.

Although the DPS policy requires an outside volunteer in order to hold Messianic Jewish worship services, at least two other faith groups at Scotland are regularly permitted to engage in inmate-led corporate worship so long as a DPS staff member is present. Pl.'s Exs. 5–6 [D.E. 61-1] 134–39. Other DPS prisons also appear to follow this latter practice with other faith groups. Cf. Ennis Aff. ¶ 9 (assistant superintendent at Eastern Correctional "said that he didn't know why the policy was written which required a volunteer to be present"); [D.E. 62-2] 26 (describing staff supervision of inmate-led worship services at Eastern Correctional). Moreover, it appears that DPS's religious practices manual specifically permits inmate-led worship services for numerous other religions. See [D.E. 62-2] 27–28. Hodges cannot engage in corporate worship due to the lack of outside volunteers, and contends that the policy as enforced "plac[es] unconstitutional restraints upon his religious practices and promotes religious discrimination[.]" Pl.'s Resp. Opp'n Mot. Summ. J. 8.

As for Hodges's kosher-diet claim, DPS did not offer a kosher diet in 2010. See Parker Aff. [D.E. 57-2] ¶¶ 7–8. Inmates (including Hodges) who requested a kosher diet could choose a lacto-ovo-vegetarian diet. Id. The RPC offered this diet after consulting with a rabbi, who "opined that

6

the Lacto-Ovo-Vegetarian Diet was sufficiently compliant with Jewish dietary law and an acceptable alternative to a Kosher diet." Id. ¶ 7.

> As the population of inmates requesting Kosher diets expanded and spread throughout the [DPS], it became increasingly more difficult to offer that diet option at all prisons. For a short time [DPS] purchased pre-made Kosher meals (akin to TV dinners) and other Kosher or pareve food products from outside vendors for inmates who required a Kosher diet.

Id. ¶ 12. However, "[a]s the demand for these Kosher diets increased, it became cost prohibitive to continue" purchasing pre-packaged meals for inmates. Id. Thus, DPS "elected to take preparation of Kosher meals in-house." Id. ¶ 13.

In 2012, DPS developed a detailed Religious Menu Accommodation policy and established kosher kitchens at several prisons, which are "equipped with necessary facilities to store, segregate, prepare and serve kosher food in accordance with Jewish dietary law." Id. ¶¶ 13, 15; see Saunders Aff. ¶ 6 & Ex. B (DPS religious menu accommodation policy). DPS again consulted with a rabbi who "opined that the plan appeared thoughtfully designed and appropriate." Parker Aff. ¶ 14. DPS incorporated suggestions by the rabbi "to ensure that Kosher and non-Kosher foods, utensils, serving apparatus, trays and plates would not be co-mingled." Id. DPS did not consult with any Orthodox or Messianic Jewish rabbis in designing its Religious Menu Accommodation policy. Pl'.s Ex. 4 [D.E. 61-1] ¶¶ 24–25, at 88–89 (Shimon affidavit). After implementing the Religious Menu Accommodation policy, DPS held "a statewide training in Kosher meal preparation . . . for all facilities selected to provide kosher meals[.]" Parker Aff. ¶ 20.

On May 7, 2013, DPS transferred Hodges from AMCI to Scotland, where it has a kosher kitchen. Id. ¶¶ 15, 19. Scotland's kitchen has "separate caged areas in both refrigerated and dry storage in the facility kitchen to provide for storage of Kosher items[,]" color-coded kosher trays and utensils, a dedicated kosher dishwashing sink, and separate storage for kosher trays, utensils, pots

7

and pans. Id. ¶¶ 21–22. A DPS regional dietician has visited Scotland numerous times to ensure compliance with the Religious Menu Accommodation policy. Id. ¶ 25. Hodges refuses to accept the kosher menu at Scotland because he believes that the Scotland kosher kitchen is not strict enough to accommodate his religious beliefs. Id. ¶ 19; Pl.'s Ex. 4 [D.E. 61-1] ¶ 32, at 90 (Shimon affidavit); cf. Pl.'s Resp. Opp'n Mot. Summ. J. 13–15. Hodges contends that the only way to accommodate his religious practice is to "provide him with a 'prepackaged Kosher meat diet meal plan . . . under a reliable rabbinical standard of certification[.]'" Id. 10; see Pl.'s Ex. 4 [D.E. 61-1] ¶¶ 31–34, at 89–90 (Shimon affidavit).

## II.

### A.

First, the court addresses Hodges's motion to deny or stay defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(d) [D.E. 60]. Generally, "summary judgment is appropriate only after adequate time for discovery." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996) (quotation omitted). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Thus, Rule 56(d) permits a court to delay ruling on a motion for summary judgment if the nonmoving party requires discovery to identify "facts essential to justify the party's opposition." Crawford-El v. Britton, 523 U.S. 574, 599 n.20 (1998) (quotation omitted); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986); Nader v. Blair, 549 F.3d 953, 961–62 (4th Cir. 2008).

A party requesting relief pursuant to Rule 56(d) must demonstrate that the party has not had

8

sufficient time to develop information needed to oppose the summary judgment motion. See, e.g., McCray v. Md. Dep't of Transp., 741 F.3d 480, 483–84 (4th Cir. 2014); Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244–45 (4th Cir. 2002). In making its determination, a court may consider the diligence that the non-moving party has demonstrated in pursuing discovery. See McCray, 741 F.3d at 484 ("[N]onmovants do not qualify for Rule 56(d) protection where they had the opportunity to discover evidence but chose not to."); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 n.2 (4th Cir. 2004); Harrods Ltd., 302 F.3d at 245–46; Strag v. Bd. of Trs., 55 F.3d 943, 953–54 (4th Cir. 1995). A court also may consider whether the case "involves complex factual questions about intent and motive." Harrods Ltd., 302 F.3d at 247. Hodges has not made the requisite showing. Thus, the court denies his request.

As for Hodges's objections to Magistrate Judge Jones's June 2014 order denying as moot his motion to compel discovery [D.E. 55], a court reviewing a magistrate judge's order on a nondispositive matter must modify a finding only if the finding is "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a); Local Civil Rule 72.4(a), EDNC; see, e.g., Rosenruist-Gestao E Servicos LDA v. Virgin Enters. Ltd., 511 F.3d 437, 441–42 (4th Cir. 2007); Stonecrest Partners, LLC v. Bank of Hampton Roads, 770 F. Supp. 2d 778, 782–83 (E.D.N.C. 2011). Judge Jones's findings are not clearly erroneous or contrary to law. Accordingly, the court denies Hodges's objections.

As for Hodges's renewed request for appointed counsel [D.E. 56], the motion lacks merit and is denied. See Order [D.E. 21] 4.

B.

Next, the court addresses defendants' motion for summary judgment. Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact

9

exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249–50. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

RLUIPA provides, in part:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005); see Holt v. Hobbs, 135 S. Ct. 853, 859–60 (2015); Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009); Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006).

Under RLUIPA, the inmate initially must show that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt, 135 S. Ct. at 862. The

10

statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Holt, 135 S. Ct. at 860; Smith, 578 F.3d at 251. A substantial burden places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion on the other hand." Lovelace, 472 F.3d at 187 (alterations and quotations omitted). The court may "not judge the significance of the particular belief or practice in question." Id. at 187 n.2.

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Smith, 578 F.3d at 250; see Holt, 135 S. Ct. at 863. "RLUIPA adopts a . . . strict scrutiny standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (alteration in original) (quotation omitted). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted); see Smith, 578 F.3d at 252. "Security concerns deserve particular sensitivity." Smith, 578 F.3d at 252 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190) (alteration in original) (citation omitted); see Holt, 135 S. Ct. at 866.

As for Hodges's section 1983 claim, the Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const.

11

amend. I. The Free Exercise Clause of the First Amendment protects inmates from unreasonable policies and regulations that are "designed to suppress religious beliefs or practices" or that unreasonably "impose a substantial burden on a prisoner's right to practice his religion." Wall v. Wade, 741 F.3d 492, 498 (4th Cir. 2014) (quotation omitted). Under the Free Exercise Clause, "a prisoner has a clearly established . . . right to a diet consistent with his . . . religious scruples." Lovelace, 472 F.3d at 198–99 (alteration in original) (quotation omitted). A prisoner, however, does not enjoy the full range of freedoms as those not incarcerated. For First Amendment purposes, "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). Thus, "a prison regulation [that] impinges on [an inmate's] constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). Moreover, courts "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace, 472 F.3d at 199. Only intentional and unjustified denials of sincerely held personal practices that are rooted in the plaintiff's religious beliefs will justify relief under the Free Exercise Clause. See, e.g., id. at 198–99.

Under the First Amendment, an inmate must demonstrate that a prison policy or regulation substantially burdens the exercise of his religion. See Lovelace, 472 F.3d at 198 n.8; Brown v. Ray, 695 F. Supp. 2d 292, 300 (W.D. Va. 2010). If an inmate shows a substantial burden, the court must then examine four factors to determine whether the policy is reasonably related to a legitimate penological interest. See Turner, 482 U.S. at 89–90.[5]

---

[5] Because the Free Exercise analysis relies on a "reasonableness" test, "RLUIPA provides more protection to inmates' free exercise rights than does the First Amendment." Al-Amin v. Shear,

12

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (alteration in original) (citations and quotations omitted); see Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001).

Defendants assert that Hodges's kosher diet claim is moot. See Defs.' Mem. Supp. Mot. Summ. J. [D.E. 58] 13–16. In support, defendants note that when a prisoner is no longer subject to the alleged unconstitutional condition, claims for injunctive and declaratory relief are moot. See, e.g., Rendelman v. Rouse, 569 F.3d 182, 186–88 (4th Cir. 2009); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (per curiam). Of course, in cases where defendants voluntarily discontinue challenged activities in order to render the challenge moot, they must satisfactorily demonstrate (1) that there is "no reasonable expectation" the alleged violation will reoccur; and (2) that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979).

As for Hodges's kosher-diet claim, Hodges questions whether certain food items are kosher and whether Scotland's kitchen personnel are complying with kosher laws in preparing and serving kosher foods. The court rejects Hodges's argument as speculative and concludes that his kosher-diet claim is moot. See, e.g., Rendelman, 569 F.3d at 186–88.

---

325 F. App'x 190, 194 n.3 (4th Cir. 2009) (per curiam) (unpublished); see Lovelace, 472 F.3d at 186, 198–200.

13

Alternatively, even if Hodges's kosher-diet claim is not moot, defendants have not substantially burdened Hodge's religious exercise concerning his diet in light of the lacto-ovo-vegetarian diet and the Religious Menu Accommodation policy. See, e.g., LeBaron v. Spencer, 527 F. App'x 25, 30–31 (1st Cir. 2013) (per curiam) (unpublished); cf. Baranowski v. Hart, 486 F.3d 112, 125–26 (5th Cir. 2007) (noting that a prison policy that did not provide kosher options to a prisoner could "be deemed to work a substantial burden" upon a prisoner's practice of his faith but finding any potential burden to be justified by a compelling governmental interest). Moreover, to the extent Hodges questions the caliber of Scotland's kitchen personnel, he has not shown that any isolated discrepancies in his food preparation constitute a significant burden on his religious beliefs. See, e.g., Colvin v. Caruso, 605 F.3d 282, 293–94 (6th Cir. 2010); Abdulhaseeb v. Calbone, 600 F.3d 1301, 1321 (10th Cir. 2010); Rapier v. Harris, 172 F.3d 999, 1006 n.4 (7th Cir. 1999); Holsombach v. Norris, No. 2:08CV00022, 2009 WL 424166, at *5–6 (E.D. Ark. Feb. 18, 2009) (unpublished); Bey v. Douglas Cnty. Corr. Facility, No. 08-3036-JAR, 2009 WL 274238, at *5 & n.38 (D. Kan. Jan. 27, 2009) (unpublished). Furthermore, any burden defendants continue to place on Hodges's religious beliefs concerning his diet are justified by the state's compelling interest in avoiding excessive costs. See, e.g., Baranowski, 486 F.3d at 125–26; Wright v. Bennett, No. 5:08-CT-3129-BO, 2010 WL 3075519, at *1–4 (E.D.N.C. Aug. 4, 2010) (unpublished), aff'd, 415 F. App'x 476 (4th Cir. 2011) (per curiam) (unpublished). Accordingly, the court grants summary judgment to defendants on plaintiff's RLUIPA and Free Exercise claims concerning a kosher diet.

As for Hodges's RLUIPA and Free Exercise claims concerning corporate worship, defendants are not entitled to summary judgment. Hodges has raised a genuine issue of material fact concerning whether DPS's enforcement of its outside-volunteer policy substantially burdens Hodges's religious exercise. See, e.g., LeBaron, 527 F. App'x at 29–30; Lovelace, 472 F.3d at

14

187–88. Although defendants contend that their outside-volunteer policy serves legitimate and compelling governmental interests in preserving prison safety and security and conserving budgetary resources,[6] the record (viewed most favorably to Hodges) shows that defendants are not applying the outside-volunteer policy uniformly and consistently. See, e.g., Holt, 135 S. Ct. at 864; Maddox v. Love, 655 F.3d 709, 719–20 (7th Cir. 2011); Smith, 578 F.3d at 253–54; Mayfield v. Texas Dep't of Criminal Justice, 529 F.3d 599, 614 (5th Cir. 2008). Thus, a trial is necessary.

A genuine issue of material fact also exists concerning whether defendants have "acknowledge[d] and give[n] some consideration to less restrictive alternatives[,]" such as permitting an inmate-led service and posting a correctional officer for security during the Messianic Jewish service. See, e.g., Holt, 135 S. Ct. at 865; Wall, 741 F.3d at 501; Smith, 578 F.3d at 252–54. Accordingly, the court denies defendants' motion for summary judgment on Hodges's RLUIPA and Free Exercise claims concerning corporate worship.

Finally, the court rejects defendants' argument that Hodges has named them as defendants on an impermissible theory of supervisory liability. See, e.g., Jackson v. Nixon, 747 F.3d 537, 544–45 (8th Cir. 2014).

III.

In sum, the court GRANTS plaintiff's motion to supplement his response in opposition to summary judgment [D.E. 62], and DENIES plaintiff's objections to Magistrate Judge Jones's June 6, 2014 order [D.E. 55], plaintiff's renewed motion for court-appointed counsel [D.E. 56], and plaintiff's motion to stay or deny summary judgment [D.E. 60]. The court GRANTS IN PART defendants' motion for summary judgment [D.E. 57], and DISMISSES plaintiff's claims concerning

---

[6] See, e.g., Smith v. Kyler, 295 F. App'x 479, 483–84 (3d Cir. 2008) (per curiam) (unpublished); Baranowski, 486 F.3d at 120–22.

a kosher diet. Plaintiff's claims concerning corporate worship survive. The court sets this matter for a bench trial on March 25, 2015, at 9:00 a.m. in courtroom one of the Terry Sanford Federal Building and United States Courthouse, Raleigh, North Carolina. The bench trial will take no longer than one day. The court expects the parties to comply with this court's local rules concerning trial preparation. See Local Civil Rule 39.1, 52.1. The pretrial order is due on March 9, 2015. The court will hold the pretrial conference on March 19, 2015, at 9:00 a.m. in courtroom one of the Terry Sanford Federal Building and United States Courthouse, Raleigh, North Carolina. The parties shall promptly notify the court of any settlement agreement or any change in DPS policy that moots Hodges's corporate-worship claims.

SO ORDERED. This 20 day of February 2015.

JAMES C. DEVER III
Chief United States District Judge